STATE OF VERMONT

| SUPERIOR COURT<br>Environmental Division Unit | ENVIRONMENTAL DIVISION<br>Docket No. 61-6-16 Vtec |
|---|---|
| Agency of Natural Resources,<br>    Petitioner<br><br>v.<br><br>Wesco, Inc.,<br>    Respondent | **DECISION ON THE MERITS** |

This matter arises out of the alleged release in 2014 of diesel fuel (a hazardous material) into surface water, groundwater and land of the state, and Respondent Wesco, Inc.'s (Respondent) alleged failure to investigate, report or respond to the release and a failure to train staff for release response, all at or on property at 56 Pearl Street, Essex Junction, Vermont. In a May 3, 2016 Administrative Order (AO),[1] the Vermont Agency of Natural Resources (ANR) alleges violations of the Vermont Waste Management law, 10 V.S.A. § 6616, and Vermont's Underground Storage Tank Rules (UST Rules). The AO sets out factual allegations describing Respondents' prohibited release and failure to investigate, report or respond to the release and failure to train staff. The AO does not seek further remediation; however, ANR seeks administrative penalties of $34,000 for the violations. ANR also directs that Respondent stop using Bio-Solve in response to petroleum releases. On July 1, 2016, Respondent requested a hearing on the AO with this Court.

The Court conducted merits hearing at the Vermont Superior Court, Costello courthouse in Burlington, Vermont on May 26, 2017. Appearing at the trial were Randy J. Miller, II, Esq. and John Zaikowski, Esq. representing the Agency of Natural Resources and Tristram J. Coffin, Esq. representing Respondents.

---

[1] The AO was filed with the Court on June 24, 2016.

**Findings of Fact**

Based upon the evidence presented at trial, the Court renders the following Findings of Fact and Conclusions of Law.

1.     Respondent owns a Champlain Farms fuel station and convenience store at 56 Pearl Street, Essex Junction, Vermont.

2.     On July 4, 2014, a customer spilled approximately 1 gallon of diesel when fueling a vehicle.

3.     The same day, the Vermont Department of Public Safety received a citizen complaint about the spill.  Steven Simoes, an Environmental Analyst with ANR's Hazardous Waste Program and a member of the State Spill Team, responded to the complaint.

4.     Mr. Simoes discovered that because the release was under two gallons of diesel, the store manager understood it to be nonreportable.  The incident was therefore not reported to ANR.

5.     A store employee had treated the spill with a cleaning agent called Bio-Solve. Approximately one gallon of Bio-Solve was mixed with ten gallons of water.

6.     Bio-Solve is a surfactant and dispersant.  While petroleum products such as diesel do not normally mix with water, a surfactant acts to reduce the surface tension of water, allowing petroleum molecules to mix with water.  A dispersant allows those petroleum molecules to then spread out in the water.

7.     Bio-Solve is not intended for capture or remediation of petroleum releases.  Rather, it is a cleaning agent which is intended to remove stains at the completion of remediation.

8.     ANR had previously told Respondent a number of times not to apply Bio-Solve directly to a spill, but instead, to contain and absorb spills using an absorbent material such as Speedi-Dry. The Speedi-Dry should then be cleaned up and managed as a hazardous waste.  ANR told Respondent that Bio-Solve should only be used as a final clean up measure. At the time of the release, Respondent's own internal protocol called for applying Speedi-Dry to contain a spill, and then using Bio-Solve afterwards if necessary.

9.     The Bio-Solve mixture was poured onto the pavement where the diesel spill occurred, presumably washing the diesel and Bio-Solve mixture into a catch basin connected to an oil /water separator located in the parking lot of the facility.

2

10. From the evidence presented at trial, it is not entirely clear whether the Bio-Solve / water mixture was applied to liquid diesel that remained on the ground, or whether some or all of the diesel had already run down the storm drain at the time the Bio-Solve / water mixture was applied.

11. Respondent retained ENPRO Services, Inc. to investigate and remediate the oil / water separator. Through this work, ENPRO discovered on July 11, 2014 that the oil / water separator was installed without a baffle. Without the baffle, petroleum discharged to the separator would not be contained within the separator and would flow through the system into the Essex municipal stormwater system.

12. The Essex municipal stormwater system discharges to the Sunderland Brook.

13. Respondent repaired the deficiency by installing the necessary baffle.

14. Respondent retained environmental consultant KAS to respond to the release. KAS determined that there was no evidence that petroleum impacted subsurface soil.

15. No evidence was provided that petroleum impacted groundwater. Because the spill ran into the storm drain, either with or without the help of the Bio-Solve; the oil / water separator on the drain was not functioning; and the storm drain leads to Sunderland Brook, some or all of the spill must have entered the brook.

16. As required by a subsequently issued Notice of Alleged Violation (NOAV), Respondent engaged in a substantial retraining program of its employees on spill remediation.

17. Respondent ceased use of Bio-Solve as a cleaning agent.

18. ANR issued an administrative order (AO) dated May 3, 2016, alleging four violations related to the release.

19. ANR's cost of enforcement included approximately $765.56 attributable to Steven Simoes, Environmental Analyst, Hazardous Waste Program; $638.22 of Chief Environmental Enforcement Officer, Department of Environmental Conservation, Sean McVeigh's time; and $370 of Environmental Analyst, UST Program, Thomas Edward Unkles' time.

20. Respondent has three prior violations of 10 V.S.A § 8003 or related rules, permits, orders or assurances of discontinuance in the prior seven years.

3

## Determining Violations and Penalty Assessment

When a respondent requests a hearing on an AO, we have the authority to determine whether the alleged violation occurred. 10 V.S.A. § 8012(b)(1). ANR carries the burden of proving the alleged violations by a preponderance of the evidence. Id. § 8013(a). If ANR meets this burden, we are required to "determine anew the amount of a penalty" that should be assessed against the respondent challenging the ANR order. Id. § 8012(b)(4). We therefore review the evidence before the Court and determine an appropriate penalty assessment, pursuant to the eight subsections of 10 V.S.A. § 8010(b)(1)–(8).

ANR, and this Court in this proceeding, must consider seven factors when assessing a penalty:

   (1) the degree of actual or potential impact on public health, safety, welfare, and the environment resulting from the violation;
   (2) the presence of mitigating circumstances, including unreasonable delay by the Secretary in seeking enforcement;
   (3) whether the respondent knew or had reason to know the violation existed;
   (4) the respondent's record of compliance;
   (5) [Repealed.]
   (6) the deterrent effect of the penalty;
   (7) the State's actual costs of enforcement; and
   (8) the length of time the violation has existed.

10 V.S.A. § 8010(b)(1)–(8). The maximum penalty for each violation is $42,500, plus $17,000 for each day a penalty continues. Id. § 8010(c)(1). Generally, ANR treats multiple violations of the same permit, or related violations generally, as one violation when calculating penalties. We take the same approach in this case, and analyze the four violations as a single violation.

The State may also "recapture economic benefit" that the violator may have derived from the violation, up to the total maximum penalty allowed of $170,000. Id. § 8010(c)(2).

In an effort to standardize penalties and ensure a fair process, ANR enforcement officers use a form that is based on the seven factors. They rate the severity of the violations from 0 to 3 for factors (1), (3), (4) and (8), and come up with an initial penalty score. The highest possible initial score is a 15, which equates to an initial penalty of $42,500 for a Class I violation, the maximum allowed. Classes II, III, and IV carry lower maximum penalties of $30,000, $10,000 and

$3,000 respectively. The initial penalty can then be adjusted based on penalty factors (2), (6) and (7). If the violator signs an Assurance of Discontinuance, agreeing not to dispute the action, the final penalty may be reduced by 25%.

A. Number of Violations

At the outset of the Court's penalty assessment, we recognize that the Administrative Order at issue in this matter alleges four violations: 1) the prohibited release of hazardous materials into the surface, groundwater or land of the state – 10 V.S.A. § 6616; 2) the failure to take appropriate action in response to a release - UST Rules § 8-103(a)(1)(A); 3) the failure to report a release of hazardous substance - UST Rules § 8-103(a)(2)(A); 4) the failure to ensure facility staff have knowledge of appropriate emergency actions to be taken in response to a spill of regulated substance – UST Rules § 8-307(a)(2).

ANR, and therefore this Court on appeal, has discretion to calculate and assess one penalty for events that result in more than one violation or to calculate and assess a separate penalty for each violation stemming from the same activity. In the AO at issue, ANR separates the four alleged violations into two penalty assessments. Because all of the alleged violations stem from the same incident, we conduct a single penalty assessment.

Respondent asserts that the events set forth in the AO do not support finding four violations. The parties do not dispute the first violation, the prohibited release of hazardous materials into the surface, groundwater or land of the state – 10 V.S.A. § 6616. Respondents do dispute the second violation, the failure to take appropriate action in response to a release - UST Rules § 8-103(a)(1)(A); the third violation, the failure to report a release of hazardous substance - UST Rules § 8-103(a)(2)(A)(i); and the fourth violation, the failure to ensure facility staff have knowledge of appropriate emergency actions to be taken in response to a spill of regulated substance – UST Rules § 8-307(a)(2).

Under the UST Rules, a facility owner or operator must immediately report a "release of hazardous material or regulated substance that exceeds 2 gallons." 16-3 Vt. Code. R. § 203:8-103(a)(2)(A)(i) (WL) (2017). Here, the initial spill was less than two gallons of diesel fuel. ANR takes the position, however, that the amount of the release for the purposes of reporting should

include the amount of diesel fuel spilled in addition to the Bio-Solve and water that were used in the attempt to clean the spill.

Concluding that the release includes the diesel, Bio-Solve, and water together would create a very expansive view the term "release." A "release" is defined by Vermont's Waste Management Act as:

> any intentional or unintentional action or omission resulting in the spilling, leaking, pumping, pouring, emitting, emptying, dumping, or disposing of hazardous materials into the surface or groundwaters, or onto the lands in the state, or into waters outside the jurisdiction of the state when damage may result to the public health, lands, waters or natural resources within the jurisdiction of the state.

10 V.S.A. § 6602(17). The UST Rules (promulgated pursuant to the Waste Management Act, see § 203:8-101) include a slightly broader definition of "release" as "any spilling, leaking, emitting, discharging, escaping, leaching or disposing from an underground storage tank into groundwater, surface water or soils." 16-3 Vt. Code. R. § 203:8-201.

The plain language of the UST Rules and statutory definitions of release involve a single act of moving a substance from an underground storage tank into groundwater, surface water, or soils. ANR would expand that definition to a two-step process: (1) the customer spill of diesel from the UST tank onto the ground; and (2) the act of pouring a Bio-Solve / water mixture onto that spilled diesel. We are reluctant to add this second step. Instead, we see the "release" as the spill of diesel from the UST onto the ground. The addition of Bio-Solve and water was meant to contain, remove, or remediate the release, and was not part of the release itself.

The UST Rules and the Waste Management Act further define "hazardous material" and "regulated substance" as including petroleum products. 10 V.S.A. § 6602(16); UST Rules § 203:8-101. The definitions do not include Bio-Solve or water. The reportable hazardous material and regulated substance in this case, therefore, was the diesel, not the Bio-Solve and water that were added to the diesel.

For these reasons, we conclude that the gallon of diesel was the release and the addition of Bio-Solve mixture to the diesel was part of Respondent's remedial effort which may have caused further contamination, but was not a part of the release. A "release" cannot be anything other than the initial act or omission that results in a contaminant being discharged to the

environment. The release of one gallon of diesel was not a reportable event and therefore the third alleged violation, the failure to report a release of hazardous substance - UST Rules §8-103(a)(2)(A)(i), is not a violation.

In the event of a release of a hazardous material or a regulated substance at a facility, the owner or operator must take "all appropriate immediate actions to protect human health and the environment including, but not limited to, emergency containment measures." UST Rules § 8-103(a)(1)(A).

Immediately following the release of diesel in this case, Respondent's employee applied a Bio-Solve / water mixture, causing the released diesel to enter the stormwater system which in turn discharges to State waters. Adding a Bio-Solve / water mixture to a release of petroleum in advance of product recovery is not an appropriate action to protect human health or the environment. Instead of containing the hazardous material, Bio-Solve causes it to dissolve and disperse in water, increasing the risk that it will spread into the environment and harm the environment or human health. Furthermore, Respondent was aware at the time of the spill that it is inappropriate to apply Bio-Solve directly to a spill. It is not entirely clear from the evidence, however, whether Respondent's employee added the Bio-Solve / water mixture directly to liquid diesel on the ground (which would have been an inappropriate response), or to the stain left after the diesel had already run down the storm drain (which may have been an appropriate response). We therefore conclude that ANR has not meet its burden of proving this violation by a preponderance of the evidence. Based on the above analysis, we conclude that Respondent committed two violations: 1) the prohibited release of hazardous materials into the surface, groundwater or land of the state – 10 V.S.A. § 6616; and 2) the failure to ensure facility staff have knowledge of appropriate emergency actions to be taken in response to a spill of regulated substance – UST Rules §§8-307(a)(2).

B. Class of Violation(s)

We conclude that the release and failure to ensure facility staff are appropriately trained events in this matter present a Class II violation. A Class II violation includes violations which present more than a minor violation of a statute listed in 10 V.S.A. §8003(a) or a rule promulgated under statute listed in 10 V.S.A. §8003(a). ANR suggested that the events presented a Class I

7

violation as a threat of substantial harm to the public health, safety, or welfare or to the environment. As detailed below, the release of one gallon of diesel and failure to ensure facility staff are appropriately trained did not result in a threat of substantial harm and we therefore decline to classify the violations as Class I.

C. Calculation of Base Penalty:

a. *Penalty Factor 1: Actual or Potential Impact on Public Health, Safety, Welfare and the Environment*

Subsection (1) of 10 V.S.A. § 8010(b) requires consideration of "the degree of actual or potential impact on public health, safety, welfare and the environment resulting from the violation."

In considering ANR's penalty calculation form, we assign a value of "0" to the degree of impact on public health, safely, and welfare (ANR form Question 1) as we conclude there was no evidence of actual impact and only minor potential impact from the release and response. The potential impact on public health, safety and welfare stemmed from the risk of ignition or explosion as well as inhaling diesel fumes. The potential of these risks was minor due to the small volume of diesel release and path that the product migrated over.

We assign a value of "1" to the degree of impact on the environment (ANR form Question 2) as we conclude there was minor actual impact and moderate potential impact to the environment from the release. ANR Administrative Penalty Form (ANR form) Questions 1 and 2. Diesel was released onto the parking lot and it migrated to an improperly constructed oil / water separator which allowed diesel to discharge to the through the separator and into the Essex municipal stormwater system. The Essex municipal stormwater system then discharges to the Sunderland Brook. This created a potential for the diesel to contaminate soil or surface water. There is no evidence beyond minor impact. The lack of training for facility staff contributed to this risk as adding the Bio-Solve mixture to the diesel spill would have allowed the petroleum to pass through the oil / water separator even if it was constructed appropriately. Either way, there the credible evidence supports a conclusion that the violation caused minor _actual_ impact that harmed the environment.

8

b. *Penalty Factor 3: Whether the Respondent Knew or Had Reason to Know the Violation Existed*

Subsection (3) of 10 V.S.A. § 8010(b) requires consideration of "whether the respondent knew or had reason to know the violation existed." The ANR penalty calculation form includes two parts related to this subsection: 3a, knowledge of the requirements, and 3b, knowledge of the facts of the violation.

Respondents knew or should have known about their legal requirements under the Waste Management statute and the facts of the violation. 10 V.S.A § 6616 is only two sentences long and clearly states that the release of hazardous material to surface or groundwater is prohibited. Thus, in considering ANR's penalty calculation form, we assign a value of "1" for respondents' knowledge of requirements (ANR form Question 3a, which assigns a "1" where respondent "had reason to know about violated requirement").

As to Respondents' knowledge of the facts of the violations we assign a value of "1," concluding there is evidence that Respondent "should have reasonably known that the violation existed" (ANR form Question 3b). For instance, there is clear evidence that respondents knew about the release, because Respondents took prompt action to cleaned it up by adding the BioSolve and water mixture.

c. *Penalty Factor 4: Respondent's Record of Compliance*

Subsection (4) of 10 V.S.A. § 8010(b) requires consideration of "the respondent's record of compliance." The evidence presented shows that Respondents had three previous violations of ANR's regulations. In considering ANR's penalty calculation from, we assign a value of "3" for this subsection (ANR form Question 4).

d. *Penalty Factor 8: Length of Time the Violation Existed*

Subsection (8) of 10 V.S.A. § 8010(b) requires consideration of "the length of time the violation has existed." The spill itself lasted for a short duration, and respondented (even if improperly) on the day it occurred. Respondents also very promptly investigated the release and determined that no additional remediation was required. Respondent retrained staff on spill remediation, and ceased using Bio-Solve.

9

In considering ANR's penalty calculation form, we assign a value of "1", concluding that this violation existed for a very short duration (ANR form Question 5).

In adding the above penalty scores we arrive at a base score of 6 which equates to a base penalty of $9,000 for a Class II violation.  See ANR form Question 6.

D. Penalty Adjustments:

We next consider appropriate adjustments to the base penalty.

a. *Penalty Factor 2: Mitigating Circumstances*

Subsection (2) of 10 V.S.A. § 8010(b) requires consideration of "the presence of mitigating circumstances, including unreasonable delay by the secretary in seeking enforcement."  Although ANR completed a prompt site visit in response to the complaint of the diesel, ANR waited from July 2014, when the violations occurred, until  May 2016, when the AO was issued—more than two years—to initiate enforcement proceedings.  Furthermore, Respondents responded promptly and attempted to bring the subject property into compliance voluntarily.  This evidence weighs heavily against the timeliness of ANR's actions.

Furthermore, Respondents immediately retained the services of KAS and ENPRO to investigate and remediate the release and to correct the faulty construction of the oil/water separator.  Lastly, Respondents retrained staff on appropriate remediation of spills and have ceased using Bio-Solve.

Based on these facts, the Court reduces Respondents' penalty based on mitigating circumstances in the amount of $2,000.

b. *Penalty Factor 6: The Deterrent Effect*

Subsection (6) of 10 V.S.A. § 8010(b) requires consideration of "the deterrent effect of the penalty."  The Secretary may increase the penalty amount up to the maximum allowed in the class of violation if the Secretary determines that a larger penalty is reasonably necessary to deter the respondent and the regulated community from committing future violations.  Id.  In this matter the maximum penalty is $30,000 and the base penalty we have calculated is $9,000, allowing for a maximum deterrent of $21,000.

10

In reviewing the importance of establishing a penalty that will have a deterrent effect upon Respondents, we consider that Respondents were cooperative with ANR throughout the investigation and remediation of the release. Furthermore, we conclude that the short period of time that the violations existed, and Respondents prompt and complete remediation of the release does not warrant a deterrent portion to be added to the initial base penalty.

c. *Penalty Factor 7: State's Actual Costs of Enforcement*

Subsection (7) of 10 V.S.A. § 8010(b) requires that we consider "the state's actual cost of enforcement." The value of the time that all ANR officials committed to responding to Respondent's violations, including prosecution of this matter, totals $1773.78. We direct Respondents to reimburse these costs as an additional penalty for the violations.

d. *Economic Benefit*

The Secretary may recapture any economic benefit Respondents may have gained by violating its permit. 10 V.S.A. § 8010(c).

While we believe that recapturing economic gain from a violation is appropriate, we conclude that based on the evidence before the Court, it appears that Respondents did not realize a gain or economic benefit from the violations. Thus, we decline to impose any amount of additional penalty relating to economic gain.

e. *Reduction for Settlement*

Finally, ANR may reduce a respondent's penalty when the respondent admits the violation and enters an Assurance of Discontinuance fully resolving the compliance issue. Such a reduction is not warranted in this matter as Respondents did not resolve their dispute by settlement.

The Court therefore decreases the base penalty of $9,000 by subtracting mitigation for ANR's delay in initiating enforcement and Respondents prompt investigation and remediation in the amount of $2,000 and add $1773.78 as reimbursement of ANR's costs of enforcement. The total penalty in this case is $ 8773.78.

11

**Conclusion**

For the reasons stated above, we conclude that for the two violations at issue within the May 3, 2016 AO, Respondents shall be liable for a total penalty in these proceedings of **$8773.78**.

**Rights of Appeal (10 V.S.A. § 8012(c)(4)–(c)(5))**

This Decision and the accompanying Judgment Order will become final if no appeal is requested within 10 days of the date this Decision is received.  All parties to this proceeding have a right to appeal this Decision and Judgment Order.  The procedures for requesting an appeal are found in the Vermont Rules of Appellate Procedure (V.R.A.P.) subject to superseding provisions in Vermont Rule for Environmental Court Proceedings (V.R.E.C.P.) 4(d)(6).  Within 10 days of the receipt of this Order, any party seeking to file an appeal must file the notice of appeal with the Clerk of the Environmental Division of the Vermont Superior Court, together with the applicable filing fee.  Questions may be addressed to the Clerk of the Vermont Supreme Court, 111 State Street, Montpelier, VT 05609-0801, (802) 828-3276.  An appeal to the Supreme Court operates as a stay of payment of a penalty, but does not stay any other aspect of an order issued by this Court.  10 V.S.A. § 8013(d).  A party may petition the Supreme Court for a stay under the provisions of the Vermont Rules of Civil Procedure (V.R.C.P.) 62 and V.R.A.P. 8.

Electronically signed on October 18, 2017 at 10:24 AM pursuant to V.R.E.F. 7(d).

_____
Thomas G. Walsh, Judge
Superior Court, Environmental Division